# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 8, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30245

———————

David M. Phillips,

*Plaintiff—Appellant*,

*versus*

L. Brands Service Company, L.L.C., *incorrectly identified as* L Brands Direct Fulfillment, LLC; Aidan Duffy, *Originally named as* Aiden Duffy; Shawn David Tolbert,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-844

———————————————————

Before Richman, *Chief Judge,* and King and Higginson, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Plaintiff-Appellant David M. Phillips contracted with Dicom Transportation Group to work as a delivery driver. In this position, he would handle deliveries for Defendant L Brands Service Company, LLC, which serviced the retail locations of both Bath and Body Works and Victoria's Secret. In 2017, after experiencing significant shrinkage at locations serviced by Phillips, Defendant-Appellee Shawn Tolbert, a logistics asset protection

No. 22-30245

manager at L Brands, and Defendant-Appellee Aidan Duffy, the regional asset protection manager at L Brands, conducted a driver observation of Phillips. After discovering several indicators of fraud and interviewing Phillips, Tolbert and Duffy concluded that Phillips had been attempting to steal product. The two reported their findings to both Dicom, who terminated Phillips's contract, and local law enforcement, who later obtained a warrant and arrested Phillips on a charge of felony theft. No formal charge was filed against Phillips.

Phillips subsequently filed suit against L Brands, Tolbert, and Duffy (collectively, "Defendants") for claims of defamation, false arrest, malicious prosecution, and negligent and intentional infliction of emotional distress. The district court granted summary judgment in favor of defendants and dismissed the case with prejudice. Phillips appeals. We AFFIRM.

## I.

In 2017, Defendant-Appellee L Brands Service Company, LLC ("L Brands") contracted with Dicom Transportation Group ("Dicom"), a warehousing and delivery company. Dicom was to help facilitate distribution of L Brands products—specifically, merchandise for the Bath and Body Works ("BBW") and Victoria's Secret ("VS") brands—in the Baton Rouge, Louisiana region. Under the contract, L Brands would ship its product from its distribution center in Columbus, Ohio to Dicom's warehouse in St. Rose, Louisiana. Dicom, in turn, would contract with delivery drivers to pick up the product from the warehouse and deliver it to individual stores within the area. Plaintiff-Appellant David Phillips worked as a delivery driver for Dicom.

In the spring and early summer of 2017, the BBW and VS stores in the Mall of Louisiana in Baton Rouge experienced some of the highest shrink (loss of product) rates in the country. Defendant-Appellee Shawn Tolbert,

then working as a logistics asset protection manager for L Brands, received notices of specific items missing from deliveries made to the Mall of Louisiana VS store on March 2, March 9, April 21, and May 11, 2017. At the same time, Defendant-Appellee Aidan Duffy, a regional asset protection manager for L Brands, reported seeing VS products for sale on various social media platforms. These products appeared to be in the original distribution center packaging, indicating that the product may have been stolen during the warehousing or delivery process. Moreover, scanned records for the store showed that all cartons of merchandise were delivered.

To keep track of its product, L Brands, working with Dicom, had implemented a tracking and scanning system using unique labels affixed to each carton with a barcode and identification number. This tracking system accounts for duplicate cartons.[1] The labels were scanned at each point in the distribution process—including when the cartons were placed on a delivery driver's truck and when they were delivered to the store.

Dicom warehouse staff would scan and load cartons onto a delivery driver's truck overnight. A single delivery to one store could consist of several hundred cartons of product. Although the truck was supposed to be packed with the day's first deliveries easily accessible in the front and the day's last deliveries in the back, with the labels facing outwards, sometimes the truck would be improperly loaded. Before heading out for delivery, drivers would be provided with paperwork reflecting the identification

---

[1] So-called "duplicate cartons" (cartons with identical labels) could enter the system by mistake, if the distribution center improperly affixed identical copies of the same label on two different cartons, or if two identical cartons were produced. The computer system would account for this duplication by labeling the second carton with the original identification number along with "-1" affixed to the end. So, for instance, if two cartons had the label "9999," the system would show the existence of both a carton 9999 and a carton 9999-1 at each step of the distribution process.

No. 22-30245

number of each carton on their truck and a handheld scanner preloaded with a digital version of that information.

At the store, drivers would scan a barcode located on the back door of a specific location to "open" the delivery. The driver would then bring the scanner into the store, where it was supposed to remain during the unloading process, and hand it over to a store employee. For delivery drivers, possessing the scanner while unloading the truck was grounds for automatic termination. Cartons were supposed to be scanned, marking them as "delivered" in the system, as the drivers brought them inside the store.

The scan history would indicate whether and when a given carton was delivered. The scanner would also note any overages, underages, or duplicates. Drivers were required to immediately call the warehouse to report any such discrepancy. Store employees were also to note any overages or underages recorded in the scanned total when signing for the delivery.[2]

Because the scanned records for the Mall of Louisiana stores indicated that all cartons were delivered for the days on which there was shrinkage, and because of the social media sales of VS products in distribution packaging, Tolbert and Duffy came to suspect that the delivery driver for that location—Phillips—might be involved with the possible theft. Accordingly, Tolbert and Duffy conducted a driver observation of Phillips on June 26, 2017. Although Phillips timely completed his deliveries, Tolbert and Duffy observed him spend an "unusual" amount of time in his truck between deliveries, which they viewed as a sign of potential fraud. Additionally, Phillips did not call to report any overage, underages, duplicates, or other discrepancies over the course of his deliveries that day.

---

[2] Given the large number of cartons in a delivery, store employees were not required to physically count the cartons received before signing off on a delivery.

No. 22-30245

At the final stop, Tolbert and Duffy approached Phillips, who had not yet finished unloading his last delivery, and explained that they were going to conduct an audit of his truck.[3] Before searching the truck, Tolbert asked Phillips if there had been any issues with the delivery that day. Phillips said no. Tolbert and Duffy then searched the truck and, in the back, found six cartons off to the side. These cartons appeared to have been tampered with—Tolbert and Duffy noticed that product from small cartons appeared to have been consolidated into larger cartons, and the cartons also contained products from both VS and BBW.[4]

Furthermore, the scanner and paperwork both showed that these cartons had been scanned as delivered to stores at the Mall of Louisiana earlier in the day. There was no record in the system of any duplicates to explain the discrepancy,[5] nor had Phillips reported any issue. Tolbert also observed discrepancies in the time stamps for the cartons in question that fit a pattern of fraud. In particular, while the remainder of the delivered cartons were scanned in quick succession, sometimes within the same second, Tolbert noticed a delay of several minutes both before and after these six cartons were scanned. Tolbert explained that this delay could be accounted for by Phillips returning to his truck to scan the six cartons before returning to scan the remaining (properly delivered) cartons.

Tolbert and Duffy proceeded to question Phillips about the six cartons. Phillips claimed that the cartons must have been duplicates that were misloaded on the truck and that his regular practice was to return the

---

[3] All delivery agents were subject to inspection by L Brands.

[4] Although mistakes at the distribution center sometimes resulted in the intermingling of differently branded products, such mistakes were very rare.

[5] For instance, there was a record showing the existence of the original carton (i.e., carton xxxx) but no record showing the existence of any duplicate (i.e., carton xxxx-1).

overages to the Dicom warehouse at the end of the day. Tolbert also called Brad Hambleton, a Dicom manager, to notify him of their findings and to ask if there was any reason why the six cartons would be in Phillips's possession. Hambleton did not offer any viable explanation. At this point, Tolbert and Duffy concluded that the most likely explanation for the presence of the six cartons was that Phillips had been attempting to steal product.

Following company policy, Tolbert and Duffy reported their findings to both Dicom and local law enforcement. Phillips, who insisted that he was not trying to steal anything, waited with Tolbert and Duffy for the police. Officers from the Livingston Parish Sheriff's Office[6] ("LPSO") arrived on the scene but concluded that they did not have jurisdiction because the cartons had been intended for a store in another parish. The LPSO officers contacted the Baton Rouge Police Department ("BRPD") to inform them of the situation.

In response, a BRPD officer working security at the Mall of Louisiana went to the BBW to see if they were missing any product. The store employees indicated that they were unaware of anything missing, which Tolbert stated was not surprising, given that the system would show that all the cartons had scanned as delivered. When Tolbert and Duffy returned the missing product to the intended stores, store employees confirmed that Phillips had taken the scanner out to the truck.

Meanwhile, Phillips was released and left the scene. The next day, Tolbert and Duffy shared their findings with Hambleton and David Pippen, another manager at Dicom. During that conversation, Tolbert and Duffy requested that Phillips be removed from the L Brands account. Dicom later

_____

[6] Phillip's last stop was in Livingston Parish.

ended its relationship with Phillips. Tolbert and Duffy also spoke with a detective with the BRPD and provided a full account of their findings.

On July 5, 2017, the BRPD prepared and obtained judicial authorization for an arrest warrant for Phillips. On October 26, 2017, officers from the New Orleans Police Department ("NOPD") pulled Phillips over for a traffic violation. After the NOPD officers discovered the outstanding warrant, they arrested Phillips. Several days later, on November 1, 2017, Phillips was transferred to East Baton Rouge Parish Prison. Phillips was later released on bail. On April 23, 2018, the District Attorney made a provisional determination not to file formal charges against Phillips.

Soon after, on June 8, 2018, Phillips filed suit in Civil District Court for the Parish of Orleans against Dicom and Pippen, a Dicom manager, asserting claims for (1) defamation, (2) false arrest, (3) malicious prosecution, (4) negligent infliction of emotional distress ("NIED"), and (5) intentional infliction of emotional distress. Phillips later amended his complaint twice, each time adding more defendants. Later, in March 2021, Phillips voluntarily dismissed his claims against all defendants except L Brands, Tolbert, and Duffy (collectively, "Defendants"), who subsequently removed the case to federal court, invoking diversity jurisdiction. The district court granted summary judgment in favor of Defendants as to all claims. Phillips appeals.

## II.

This court reviews a district court's grant of summary judgment *de novo*, applying the same standards as the district court. *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 (5th Cir. 2009). Summary judgment is proper when the moving party can demonstrate that, viewing the evidence in the light most favorable to the non-moving party, there is no issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 840-

No. 22-30245

41 (5th Cir. 2013). "A genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A panel may affirm on "any ground supported by the record, even if it is different from that relied on by the district court." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012) (citation omitted).

On appeal, Phillips contends that the district court erred in granting summary judgment as to his claims for (1) defamation, (2) malicious prosecution, and (3) negligent infliction of emotional distress.[7] We address each in turn.

## A.

We begin with Phillips's defamation claim. His claim is premised upon two separate communications by Tolbert and Duffy (and by extension, L Brands): first, when they contacted local police to report the alleged theft and second, when they reported the results of their investigation to Hambleton and Pippen, managers at Dicom, and requested that Phillips be removed from the L Brands account.

Under Louisiana law, which we apply in this diversity case, *Seacor Holdings, Inc. v. Commonwealth Ins. Co.*, 635 F.3d 675, 680 (5th Cir. 2011), a plaintiff must establish four elements to bring a defamation claim: "(1) a false and defamatory statement concerning another; (2) an unprivileged

---

[7] In his opening brief, Phillips fails to address the district court's grant of summary judgment as to both his false arrest claim and intentional infliction of emotional distress claim and, in his reply brief, did not contest that he has abandoned these claims. *See Crose v. Humana Ins. Co.*, 823 F.3d 344, 351 n.5 (5th Cir. 2016) ("We have consistently held that failure to brief an issue in the opening brief abandons that issue on appeal . . . . regardless of whether the claims are intertwined or related." (citation omitted)).

publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Johnson v. Purpera*, 320 So. 3d 374, 386-87 (La. 2021). The Louisiana Supreme Court has explained that the "fault requirement is often set forth in the jurisprudence as malice, actual or implied." *Costello v. Hardy*, 864 So. 2d 129, 139 (La. 2004). "Thus, in order to prevail on a defamation claim, a plaintiff must prove 'that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.'" *Id.* at 139-40 (quoting *Trentecosta v. Beck*, 703 So. 2d 552, 559 (La. 1997)).

At least with respect to communications with Dicom, Defendants argue that Phillips fails to establish the first element: the existence of a defamatory statement.[8] According to Defendants, the record reflects that Tolbert and Duffy merely reported the results of their investigation—none of these statements, on their own, was either false or accusatory. Yet we need not parse the exact wording of each statement. Considered together and taken in the context of their request for Phillips to be removed from the L Brands account, Tolbert and Duffy were accusing Phillips of criminal conduct. *See id.* at 140 ("Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se." (citations omitted)).

Regardless of whether the statements were defamatory, Defendants contend that these statements are protected by the conditional privilege. "In Louisiana, privilege is a defense to a defamation action." *Kennedy v. Sheriff*

---

[8] Defendants do not dispute that the communications to the police, in which Tolbert and Duffy reported Phillips for theft, would be defamatory per se.

*of E. Baton Rouge*, 935 So. 2d 669, 681 (La. 2006) (citing *Costello*, 864 So. 2d at 141). This privilege can be either absolute or conditional, *see id.*; here, Defendants assert only the conditional privilege.[9]

The conditional privilege operates by shifting the burden from the defendant to rebut the plaintiff's allegation of fault to the plaintiff to establish an abuse of the privilege. *Id.* at 687. In other words, determining the application of the conditional privilege involves two steps: first, the court must determine whether the circumstances occasion the assertion of the privilege and second, the court must decide whether the privilege was abused. *Hakim v. O'Donnell*, 144 So. 3d 1179, 1188 (La. App. 2 Cir. 2014).

The first step involves a determination as to whether, as a matter of law, the "circumstances in which a communication was made satisfy the legal requirements for invoking the conditional privilege." *Cook v. Am. Gateway Bank*, 49 So. 3d 23, 33 (La. App. 1 Cir. 2010) (citing *Smith v. Our Lady of the Lake Hosp., Inc.*, 639 So. 2d 730, 745 (La. 1994)). In determining the boundaries of this privilege, courts consider the purpose of the conditional privilege, which seeks to recognize

> the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate.

*Kennedy*, 935 So. 2d at 681-82 (quotation omitted).

---

[9] Nor could Defendants successfully assert an absolute privilege, which applies to a limited number of circumstances—such as statements by judges in judicial proceedings or legislators in legislative proceedings—not present here. *Kennedy*, 935 So. 2d at 681.

No. 22-30245

Accordingly, although there is no "precise formula" to calculate the scope of the conditional privilege, its elements "have been described as good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only." *Id.* at 681 (quotation and citations omitted).

There is no meaningful dispute that Tolbert and Duffy's statements were made to proper parties. First, as to their report to local law enforcement, Louisiana courts have consistently recognized that good faith reports to law enforcement as to suspected criminal activity are covered by the conditional privilege. *See, e.g.*, *id.* at 683; *see also Bradford v. Judson*, 12 So. 3d 974, 980 (La. App. 2 Cir. 2009) (explaining that *Kennedy* established that "there is no civil liability imposed on a citizen for inaccurately reporting criminal misconduct with no intent to mislead"); *Cook*, 49 So. 3d at 33 ("A good faith report to law enforcement officers of suspected criminal activity may appropriately be characterized as speech on a matter of public concern."). Indeed, Phillips himself acknowledges that the conditional privilege applies in such circumstances.

Second, as to Tolbert and Duffy's statements to Dicom management, courts have extended the conditional privilege to good faith reports of suspected wrongdoing made where the parties share a common business or financial interest. *See, e.g.*, *Bradford*, 12 So. 3d at 982 (concluding conditional privilege covered communications between a university president's wife and an alumna about the president of the alumni association on the basis that both women shared an interest in the welfare of the school); *Roux v. Pflueger*, 16 So. 3d 590, 596 (La. App. 4 Cir. 2009) (affirming summary judgment to the defendants on the grounds that the conditional privilege applied to statements between members of a church's finance council and the vicar general of their archdiocese about discrepancies in the church's financial records and missing church property). And here, the parties do not dispute

that L Brands had an ongoing business relationship with Dicom, its distributor, and Tolbert and Duffy's statements directly related to that relationship—namely, L Brands' control over who worked on their account.

Rather than engage with these facts, Phillips suggests that the conditional privilege does not apply because Tolbert and Duffy made defamatory statements to other, improper, third parties—namely, other drivers and Phillips's family. Nothing in the record, however, supports these allegations. For example, although Phillips highlights the affidavit of Mizel Henry, another third-party contractor, to show that other drivers were told Phillips had stolen from L Brands, this affidavit contains no factual indication that Tolbert, Duffy, or anyone else from L Brands made such a statement. Instead, Henry's affidavit states that Pippen, a manager at Dicom, spoke with him about Phillips's alleged theft.[10] Similarly, although Phillips alleges that L Brands made defamatory statements to members of his family, he fails to provide any citation to the record to support this contention.[11]

Perhaps recognizing the weakness in this position, Phillips primarily argues that Defendants fail on the second step of the conditional privilege analysis—that is, he argues that Defendants have abused the privilege. To demonstrate abuse of the privilege, the plaintiff must show that the "defendant's remarks [were] made with malice or without good faith or for a purpose outside of the scope of the privilege." *Kennedy*, 935 So. 2d at 683-84. In defamation cases, "'good faith' is synonymous with 'without malice,'

---

[10] Neither Dicom nor any of its employees is currently a defendant in this action.

[11] At most, Phillips can point to a line in the next steps section of the "Investigation Recap" Tolbert prepared for L Brands the day after the truck search, which stated that Tolbert and Duffy would "continu[e] to review and investigate two relatives of Phillips who also deliver to L [B]rands for Dicom." Nothing in this presentation, however, indicates that Tolbert and Duffy contacted Phillips's relatives. In fact, Tolbert testified that neither he nor Duffy conducted any further investigation of Phillips's relatives.

and means having reasonable grounds for believing the statement is correct." *Id.* at 684. Thus, Louisiana courts have explained that "[t]he conditional privilege is abused if the publisher (a) knows the matter to be false; or (b) acts in reckless disregard as to its truth or falsity." *Cook*, 49 So. 3d at 34 (citing *Kennedy*, 935 So. 2d at 684).

Under this standard, "[m]ere negligence as to falsity is not sufficient to amount [to] abuse of a conditional or qualified privilege." *Kennedy*, 935 So. 2d at 689 (citing Restatement (Second) of Torts § 600 cmt. b.). Instead, the plaintiff "must prove that the publication was deliberately falsified, published despite the defendant's awareness of probable falsity, or the defendant in fact entertained serious doubts as to the truth of his publication." *Jalou II, Inc. v. Liner*, 43 So. 3d 1023, 1037 (La. App. 1 Cir. 2010) (citing *Kennedy*, 935 So. 2d at 688).

Although "the second step of determining abuse of a conditional or qualified privilege or malice is generally a fact question unless only one conclusion can be drawn from the evidence," *Hakim*, 144 So. 3d at 1188, "because of the chilling effect on the exercise of free speech, defamation actions have been found particularly susceptible to summary judgment," *Kennedy*, 935 So. 2d at 686 (determining that the conditional privilege applied and affirming a grant of summary judgment in favor of the defendant on that basis). In practice, because the bar for establishing abuse of the conditional privilege is so high, the application of the conditional privilege is often decided at the summary judgment stage. *See, e.g.*, *Barber v. Willis Commc'ns, Inc.*, 241 So. 3d 471, 477-78 (La. App. 1 Cir. 2017) (affirming a grant of summary judgment to the defendant after finding that the defendant's communications were covered by the conditional privilege and that the plaintiff had failed to present evidence that the defendant was "highly aware that the statement . . . was probably false"); *Bindom v. Kirby*, 276 So. 3d 550, 557 (La. App. 1 Cir. 2019) (similar); *compare Bradford*, 12 So. 3d at 983

(concluding that a genuine dispute of fact existed as to whether the conditional privilege was abused where the defendant had sent an email accusing the plaintiff of theft in regards to a "business dispute which had lasted, at that time, a few short weeks").

Here, not only does the record fail to show that Tolbert and Duffy either knew that their statement that Phillips had stolen merchandise to be false or acted in reckless disregard as to its falsity, but it also contains ample evidence supporting Tolbert and Duffy's assertions that they were justified in believing their statements to be accurate. The following facts support the reasonableness of Tolbert and Duffy's conclusion that Phillips had engaged in wrongdoing: (1) the context of the investigation, particularly the shrinkage at the Mall of Louisiana locations and the existence of online sale postings in the area for product that appeared to be in delivery packaging, which suggested potential misconduct on the part of the delivery driver; (2) their own observation that Phillips appeared to spend an unusual amount of time in the back of his truck during his deliveries; (3) the presence of six cartons that had been scanned as having been delivered earlier in the day in the back of Phillips's truck after he was audited at his last stop; (4) the scan history, which showed irregular time gaps between the time when those six cartons were scanned relative to the other cartons; (5) the lack of any record in either the paper bill of lading or the scan history to corroborate Phillips's claim that the cartons must have been duplicates; (6) the state of the six cartons, in which the BBW and VS products had been consolidated into the larger cartons; and (7) the inability of Phillips's supervisor, Hambleton, to provide a plausible explanation for the presence of the six cartons in the back of the truck. Considered together, these facts support a good-faith suspicion that Phillips was involved in the theft of L Brands merchandise.

Nonetheless, Phillips contends that Tolbert and Duffy's failure to take *further* investigative steps raises a triable issue of fact as to whether they

acted with malice (or without good faith). This argument, however, is expressly foreclosed by precedent. In *Kennedy v. Sheriff of East Baton Rouge*, the Louisiana Supreme Court explained that a "failure to investigate does not present a jury question on whether a statement was published with reckless disregard for the truth." 935 So. 2d at 689.

In fact, Phillips's argument is essentially the same that was at issue in *Kennedy* itself. There, the plaintiff brought a claim for defamation after employees at a fast-food restaurant called the police to report their suspicion that he had attempted to purchase food with a counterfeit bill. *Id.* at 688. The district court granted summary judgment in favor of defendants, finding that the record lacked any showing of malice to support a defamation claim. *Id.* at 674. The intermediate court reversed, finding that because there was no showing that the restaurant employees had been trained in the detection of counterfeit money, the defendants failed to show that the employees had acted reasonably or without reckless disregard when calling in a report based on the unusual appearance of the bill.[12] *Id.* at 674, 688-89.

The Louisiana Supreme Court firmly rejected this approach, which it described as hinging on the employees' "fail[ure] to take reasonable measures to verify the authenticity of the bill before reporting their suspicions to police." *Id.* at 689. While acknowledging that it might have been "more reasonable" for the restaurant to have provided employees with such training, the Louisiana Supreme Court emphasized that a plaintiff "cannot show reckless disregard for the truth by demonstrating only that the defendant acted negligently and failed to investigate fully before contacting police." *Id.* Rather, the Court clarified, "reckless disregard is typically found

---

[12] The affidavits of the two Sheriff's deputies who responded to the call supported that the bill in question, a 1974 series one-hundred-dollar bill being offered for use in 2001, looked "suspicious." *See id.* at 689.

where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbable that only a reckless man would have put it in circulation." *Id.* As was the case in *Kennedy*, Phillips points to nothing in the record to demonstrate such conduct on the part of Tolbert and Duffy and thus fails to demonstrate any abuse of the conditional privilege.

In sum, the statements at issue were limited communications that were made in good faith and only to interested parties. Accordingly, the conditional privilege applies such that Phillips cannot prevail on his defamation claim. We therefore AFFIRM the district court's grant of summary judgment on the defamation claim.

**B.**

We now turn to Phillips's malicious prosecution claim. To bring a claim for malicious prosecution under Louisiana law, a plaintiff must establish six elements:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff.

*Lemoine v. Wolfe*, 168 So. 3d 362, 367 (La. 2015) (quoting *Jones v. Soileau*, 448 So. 2d 1268, 1271 (La. 1984)); *see also Smith v. City Bank & Trust Co.*, 271 So. 3d 263, 267 (La. 2016) ("The plaintiff ordinarily bears the burden of proof on all the elements of the malicious prosecution action." (citation omitted)). "Strict compliance with all essential elements is required" for a malicious

prosecution claim.[13] *Gentry v. Spillers*, 325 So. 3d 398, 406 (La. App. 1 Cir. 2021).

Here, Phillips's malicious prosecution claim is coterminous with his defamation claim, resting on Tolbert and Duffy's report to law enforcement about the suspected theft. It must therefore fail for the same reason as his defamation claim—his failure to show the existence of malice. In a malicious prosecution action, malice "exists when a charge is made with knowledge that it is false or with reckless disregard for the truth." *Kelly v. W. Cash & Carry Bldg. Mat. Store*, 745 So. 2d 743, 761 (La. App. 4 Cir. 1999). The Louisiana Supreme Court has elaborated that "[m]alice is found when the defendant uses the prosecution for the purpose of obtaining any private advantage," including for purposes of extortion, to force performance of a contract, to intimidate a witness, or "as an experiment to discover who might have committed the crime." *Miller v. E. Baton Rouge Par. Sheriff's Dep't*, 511 So. 2d 446, 453 (La. 1987).

As discussed above, Defendants provided evidence supporting their position that they reported their findings with the honest and reasonable belief that Phillips had attempted to steal cartons of L Brands merchandise. As with his defamation claim, Phillips provides no evidence to dispute this

---

[13] We briefly note that, in addition to arguing that Phillips is unable to satisfy the second, fourth, and fifth prongs of a malicious prosecution claim, Defendants contend that the conditional privilege should be extended to bar both Phillips's malicious prosecution and negligent infliction of emotional distress claims. So far, only one state intermediate court, seemingly in *dicta*, has endorsed such an expansion of the conditional privilege, *see Adams v. Harrah's Bossier City Investment Co., LLC*, 948 So. 2d 317, 320 (La. App. 2 Cir. 2007), and at least one federal district court has straightforwardly rejected it, *see Johnson v. Regions Bank*, No. 20-533, 2020 WL 3606267 at *6 (E.D. La. July 1, 2020). As we may decide this claim on alternative grounds, we decline to wade into what appears to be a still unsettled and important question of Louisiana state law.

No. 22-30245

contention. Finally, to the extent that Phillips asserts that the existence of malice is necessarily an issue of fact to be decided by the jury, Louisiana courts routinely determine the malice question at the summary judgment stage. *See, e.g.*, *Keppard v. AFC Enters., Inc.*, 802 So. 2d 959, 965-66 (La. App. 4 Cir. 2001); *Gaspard v. Provensal*, 195 So. 3d 1287, 1290 (La. App. 4 Cir. 2016).

Because Phillips is unable to establish the fifth element of a malicious prosecution claim, we need not reach the other elements. We AFFIRM the district court's grant of summary judgment in favor of Defendants.

## C.

Last, we address Phillips's negligent infliction of emotional distress claim (NIED) claim. To bring an NIED claim, a plaintiff must prove five separate elements, a negative answer as to any of which results in a determination of no liability. *Covington v. Howard*, 146 So. 3d 933, 937 (La. App. 2 Cir. 2014) (citing *Mathieu v. Imperial Toy Corp.*, 646 So. 2d 318, 322 (La. 1994)). Importantly, Louisiana does not recognize NIED as an independent tort. *Simmons v. State*, 255 So. 3d 701, 705 (La. App. 4 Cir. 2018); *see also Kelly*, 745 So. 2d at 760 (explaining that a plaintiff's claims for emotional distress "would have been as an element of damage arising out of her claims for false imprisonment and arrest, defamation and malicious prosecution" and therefore, because those claims failed, it did not give rise to a separate cause of action). Here, because Phillips's NIED claim is derivative of his defamation and malicious prosecution claims, it must fail for the same reasons.[14]

---

[14]Notably, in briefing this claim, Phillips simply repeats his argument that Defendants are liable because they failed to conduct further investigation.

No. 22-30245

Accordingly, we AFFIRM the district court's grant of summary judgment as to Phillips's negligent infliction of emotional distress claim.

## III.

For the foregoing reasons, the district court's judgment is AFFIRMED.